UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LAUREN FONSECA<br><br>          Plaintiff,<br><br>     -against-<br><br>SLACK TECHNOLOGIES, INC.,<br>STEWART BUTTERFIELD, ANDREW<br>BRACCIA, EDITH COOPER, SARAH<br>FRIAR, SHEILA JORDAN, MIKE<br>MCNAMARA, JOHN O'FARRELL, and<br>GRAHAM SMITH,<br><br>          Defendants. | CASE NO.: _____<br><br>COMPLAINT<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Lauren Fonseca ("Plaintiff"), by and through her attorneys, alleges the following

upon information and belief, including investigation of counsel and review of publicly-available

information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal

knowledge:

**NATURE OF THE ACTION**

1.      This is an action brought by Plaintiff against Slack Technologies, Inc. ("Slack" or

the "Company") and members of the Company's board of directors (collectively referred to as the

"Board" or the "Individual Defendants" and, together with Slack, the "Defendants") for their

violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"),

15 U.S.C. §§ 78n(a), 78t(a) respectively, United States Securities and Exchange Commission

("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9, and for breaching their fiduciary duty of candor.

Plaintiff's claims arise in connection with the proposed merger between the Company and

Salesforce.com, Inc. ("Salesforce") and its subsidiaries ("Proposed Transaction").

2.      On October 1, 2020, Slack entered into an Agreement and Plan of Merger by and

1

among (i) the Company, (ii) Salesforce, (iii) Skyline Strategies I Inc. ("Merger Sub I"), and (iv) Skyline Strategies II LLC ("Merger Sub II") (the "Merger Agreement"). Pursuant to the Merger Agreement, shareholders of Slack common stock will receive 0.0776 shares of Salesforce common stock and the right to receive $26.79 in cash, without interest (the "Merger Consideration").

3.      On December 23, 2020, in order to convince Slack's public common stockholders to vote in favor of the merger, the Board authorized the filing of a materially incomplete and misleading Form S-4 Registration Statement Definitive Registration Statement (the "Registration Statement") with the SEC. The Registration Statement contains material omissions concerning: (i) the financial projections for Slack, and (ii) the valuation analyses performed by the Company's financial advisors, Qatalyst Partners LP ("Qatalyst") and Goldman Sachs & Co. LLC ("Goldman Sachs").

4.      The shareholder vote will be scheduled in the coming weeks as the merger is expected to close prior to August 1, 2021 after which date terms to the Merger Agreement are subject to change (the "Shareholder Vote"). It is imperative that the material information that has been omitted from the Registration Statement is disclosed to the Company's stockholders prior to the Shareholder Vote so they can properly determine whether to vote for or against the Proposed Transaction.

5.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, Rule 14a-9, and Delaware State law.  Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to Slack's public common stockholders sufficiently in advance of the upcoming Shareholder Vote

or, in the event the Proposed Transaction is consummated, to recover damages resulting from the

Defendants' misconduct.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of

the Exchange Act and 28 U.S.C. § 1331 because the claims asserted herein arise under Sections

14(a) and 20(a) of the Exchange Act and Rule 14a-9.

9.      This Court also has jurisdiction over the duty of candor claim pursuant to 28 U.S.C.

§ 1367.

10.     Personal jurisdiction exists over each Defendant either because the Defendant

conducts business in or maintains operations in this District, or is an individual who is either

present in this District for jurisdictional purposes or has sufficient minimum contacts with this

District as to render the exercise of jurisdiction over each Defendant by this Court permissible

under the traditional notions of fair play and substantial justice. "Where a federal statute such as

Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes

whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r

Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has

minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over

the defendant in any federal district court." *Id.* at 1316.

11.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. §

78aa, as well as 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact

business in this District. Indeed, the Company's financial and legal advisors are headquartered in

this District, and its stock trades on the New York Stock Exchange ("NYSE") which is also

headquartered in this District. *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir.

2003) (collecting cases).

## PARTIES

12.     Defendant Slack is a Delaware corporation with its principal executive offices located at 500 Howard Street San Francisco, California 94105. The Company's common stock trades on the NYSE under the ticker symbol "WORK".

13.     Defendant Steward Butterfield is, and has been at all relevant times, the Chief Executive Officer and Co-Founder of Slack.

14.     Defendant Andrew Braccia is, and has been at all relevant times, a director of Slack.

15.     Defendant Edith Cooper is, and has been at all relevant times, a director of Slack.

16.     Defendant Sarah Friar is, and has been at all relevant times, a director of Slack.

17.     Defendant Sheila Jordan is, and has been at all relevant times, a director of Slack.

18.     Defendant Mike McNamara is, and has been at all relevant times, a director of Slack.

19.     Defendant John O'Farrell is, and has been at all relevant times, a director of Slack.

20.     Defendant Graham Smith is, and has been at all relevant times, a director of Slack.

21.     Defendant John M. Jureller is, and has been at all relevant times, a director of Slack.

22.     Defendant Syed T. Kamal is, and has been at all relevant times, a director of Slack.

23.     The defendants identified in paragraphs 13 through 22 are collectively referred to herein as the "Board" or the "Individual Defendants," and together with Slack, the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### A.  Background of the Proposed Transaction

24.     Slack is the leading channel-based messaging platform, used by millions to "align their teams, unify their systems, and drive their businesses forward." Slack offers an enterprise-

grade environment that can scale with the largest companies in the world. It is a new layer of the

business technology stack where people can work together more effectively, connect all their other

software tools and services, and find the information they need to do their best work.

25.     Salesforce, the global customer relationship management ("CRM") leader,

empowers companies of every size and industry to digitally transform and create a 360° view of

their customers.

26.     On December 1, 2020, Slack authorized the announcement of the Proposed

Transaction. The press release stated in relevant part as follows:

### Salesforce Signs Definitive Agreement to Acquire Slack

SAN FRANCISCO--(BUSINESS WIRE)-- Salesforce (NYSE: CRM), the global leader in CRM, and Slack Technologies, Inc. (NYSE: WORK), the most innovative enterprise communications platform, have entered into a definitive agreement under which Salesforce will acquire Slack. Under the terms of the agreement, Slack shareholders will receive $26.79 in cash and 0.0776 shares of Salesforce common stock for each Slack share, representing an enterprise value of approximately $27.7 billion based on the closing price of Salesforce's common stock on November 30, 2020.

Combining Slack with Salesforce Customer 360 will be transformative for customers and the industry. The combination will create the operating system for the new way to work, uniquely enabling companies to grow and succeed in the all-digital world.

"Stewart and his team have built one of the most beloved platforms in enterprise software history, with an incredible ecosystem around it," said Marc Benioff, Chair and CEO, Salesforce. "This is a match made in heaven. Together, Salesforce and Slack will shape the future of enterprise software and transform the way everyone works in the all-digital, work-from-anywhere world. I'm thrilled to welcome Slack to the Salesforce Ohana once the transaction closes."

"Salesforce started the cloud revolution, and two decades later, we are still tapping into all the possibilities it offers to transform the way we work. The opportunity we see together is massive," said Stewart Butterfield, Slack CEO and Co-Founder. "As software plays a more and more critical role in the performance of every organization, we share a vision of reduced complexity, increased power and flexibility, and ultimately a greater degree of alignment and organizational agility.

Personally, I believe this is the most strategic combination in the history of software, and I can't wait to get going."

Acquisition to Create the Operating System for the New Way to Work

The events of this year have greatly accelerated the move by companies and governments to an all-digital world, where work happens wherever people are—whether they're in the office, at home or somewhere in between. They need to deliver connected experiences for their customers across every touchpoint and enable their employees to work seamlessly wherever they are.

Together, Salesforce and Slack will give companies a single source of truth for their business and a unified platform for connecting employees, customers and partners with each other and the apps they use every day, all within their existing workflows.

Slack to Become the New Interface for Salesforce Customer 360

Salesforce is the #1 CRM that enables companies to sell, service, market and conduct commerce, from anywhere. Slack brings people, data and tools together so teams can collaborate and get work done, from anywhere. Slack Connect extends the benefits of Slack to enable communication and collaboration between a company's employees and all its external partners, from vendors to customers.

Slack will be deeply integrated into every Salesforce Cloud. As the new interface for Salesforce Customer 360, Slack will transform how people communicate, collaborate and take action on customer information across Salesforce as well as information from all of their other business apps and systems to be more productive, make smarter, faster decisions and create connected customer experiences.

Slack To Expand Enterprise Footprint as Part of the World's #1 CRM

Slack serves leading organizations in every industry around the world, from the fastest growing startups to Fortune 500 companies, such as Starbucks, Target and TD Ameritrade, along with leading academic institutions, non-profits, and governments in more than 150 countries.

As part of the world's #1 CRM, Slack will be able to expand its presence in the enterprise, not just among Salesforce customers, but for any company undergoing digital transformation. Upon the close of the transaction, Slack will become an operating unit of Salesforce and will continue to be led by CEO Stewart Butterfield.

Combination to Form the Largest Open Ecosystem of Apps and Workflows for Business

Connecting people and data across systems, apps and devices is one of the biggest challenges companies face in today's all-digital world.

6

Slack's open platform seamlessly integrates with more than 2,400 apps that people use to collaborate, communicate and get work done. With the largest enterprise app ecosystem, the Salesforce platform is the easiest way to build and deliver apps to connect with customers in a whole new way.

Together, Salesforce and Slack will create the most extensive open ecosystem of apps and workflows for business and empower millions of developers to build the next generation of apps, with clicks not code.

Details on the Proposed Transaction

The board of directors of each of Salesforce and Slack have approved the transaction and the Slack board recommends that Slack stockholders approve the transaction and adopt the merger agreement. The transaction is anticipated to close in the second quarter of Salesforce's fiscal year 2022, subject to approval by the Slack stockholders, the receipt of required regulatory approvals and other customary closing conditions.

Salesforce has also entered into a voting agreement with certain stockholders of Slack common stock, under which each such stockholder has agreed to vote all of their Slack shares in favor of the transaction at the special meeting of Slack stockholders to be held in connection with the transaction, subject to certain terms and conditions. The Slack shares subject to the agreement represent approximately 55% of the current outstanding voting power of the Slack common stock.

Salesforce expects to fund the cash portion of the transaction consideration with a combination of new debt and cash on Salesforce's balance sheet. Salesforce has obtained a commitment from Citigroup Global Markets Inc., Bank of America, N.A. and JPMorgan Chase Bank, N.A. for a $10.0 billion senior unsecured 364-day bridge loan facility, subject to customary conditions.

27.     Piggybacking off the uncertainty of Pandemic and the accounting scandal, the Proposed Transaction may inordinately compensate Salesforce and reward the Individual Defendants, all at the expense of the Company's common stockholders. Therefore, it is imperative that stockholders receive the material information (discussed in detail below) that Defendants have omitted from the Registration Statement, which is necessary for stockholders to properly exercise their corporate suffrage rights and in order to cast an informed vote on the Proposed Transaction.

**B.  The Registration Statement Omits Certain Material Information**

28.     On December 23, 2020, Defendants authorized the filing of a materially incomplete

and misleading Registration Statement with the SEC. The Individual Defendants were obligated

to carefully review the Registration Statement before it was filed with the SEC and disseminated

to the Company's stockholders to ensure that it did not contain any material misrepresentations or

omissions. However, the Registration Statement misrepresents or omits material information

concerning the companies' financial projections, as well as Goldman Sachs' and Qatalyst's

financial analyses. This information is necessary for Slack's stockholders to make an informed

decision on how to vote their shares, in violation of Sections 14(a) and 20(a) of the Exchange Act,

and SEC Rule 14a-9.

29.     *First*, the Registration Statement fails to provide Net Income projections for any of

the projection sets, which has courts frequently consider to constitute material information. This

is because Net Income is often considered one the most comparable metrics to those utilizing

Generally Accepted Accounting Principles ("GAAP"). The inclusion of Net Income is therefore

necessary for Slack stockholders to ensure that the Merger Consideration is premised on

projections that were reasonably prepared. The failure to disclose the Net Income also obfuscates

the financial picture of both companies and provides a misleadingly incomplete representation of

the projections tables and valuation analyses summarized in the Registration Statement. As

Regulation S-K of the SEC explains, when disclosing revenue, it should be disclosed together with

net income to prevent a misleading representation of corporate value:

> Although traditionally projections have been given for three financial items
> generally considered to be of primary importance to investors (revenues, net
> income (loss) and earnings (loss) per share), projection information need not
> necessarily be limited to these three items. However, management should take care
> to assure that the choice of items projected is not susceptible of misleading
> inferences through selective projection of only favorable items. Revenues, net

income (loss) and earnings (loss) per share usually are presented together in order
to avoid any misleading inferences that may arise when the individual items reflect
contradictory trends.

17 C.F.R. § 229.10(b)(1). Here, the projections disclosed revenue but omitted net income.

30.     ***Second***, the Registration Statement misleading states or omits material information regarding the analyses performed by Goldman Sachs and Qatalyst in rendering their fairness opinions.

31.     With respect to Qatalyst's *Illustrative Discounted Cash Flow Analysis*, the Registration Statement fails to disclose: (i) all line items used to calculate unlevered free cash 19 flows; (ii) the underlying inputs used to derive the discount rate of 8.25% to 9.75%; (iii) theterminal values for Slack; (iv) the basis for applying a range of fully diluted enterprise value to next-12-month's estimated UFCF multiples 30.0x to 45.0x; (v) the cash and cash equivalents of Slack as of October 31, 2020; (vi) the number of fully diluted outstanding shares of Slack  common stock; (vii) the face value of Slack's outstanding convertible debt as of October 31, 2020; and (viii) the value of Slack's non-controlling interest as of October 31, 2020.

32.     With respect to Goldman Sachs' *Implied Premia and Multiples Analysis*, the Registration Statement fails to disclose: (i) the total number of fully diluted shares of Slack common stock outstanding; and (ii) Slack's net debt.

33.     With respect to Goldman Sachs' *Illustrative Discounted Cash Flow Analysis*, the Registration Statement fails to disclose: (i) all line items used to calculate unlevered free cash flow less stock-based compensation; (ii) the underlying inputs used to derive the discount rate of 6.5% to 9.5%; (iii) the terminal values for Slack; (iv) the basis for applying an illustrative range of terminal year multiples of 25.0x to 35.0x to an assumed terminal year NTM unlevered free cash flow and the basis for applying perpetuity growth rates ranging from 2.3% to 6.3% (v) the number

of fully diluted outstanding shares of Slack common stock; (vi) the net debt of Slack; and (vii) the net present value of the net operating losses and the basis for using an illustrative discount rate of 8.0%.

34.     With respect to Goldman Sachs' *Illustrative Present Value of Future Share Price Analysis*, the Registration Statement fails to disclose: (i) Goldman Sachs' basis for applying enterprise value to NTM revenue multiples of 16.0x to 20.0x to NTM revenue estimates for Slack for each of the fiscal years 2022 to 2024; and (ii) the inputs underlying the discount rate of 8.0%.

35.     With respect to Goldman Sachs' *Premia Analysis*, the Registration Statement fails to disclose the premia and transactions observed by Goldman Sachs in the analysis.

36.     With respect to Goldman Sachs' *Selected Companies Analysis*, the Registration Statement fails to disclose the individual multiples and metrics for the companies observed by Goldman Sachs in the analysis.

37.     Fairness opinions are fundamental to the M&A process and is ultimately what stockholders rely upon in their determination to vote for or against a transaction. Unfortunately, fairness opinions are also vulnerable to manipulation, which is why it is of the utmost important that stockholders have analyses available—such as those omitted here—to determine whether those metrics are reasonable, or whether they were unreasonably selected in order to obtain a finding of fairness. In valuing transactions such as these, it becomes all the more critical. As one highly respected professor explained in one of the most thorough law review articles regarding the fundamental flaws of fairness opinions, in a financial analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006). Such choices include "the appropriate discount rate, and the terminal value…" *Id.* As Professor Davidoff

explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques.  This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness.  This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78. Therefore, in order for stockholders to determine how to vote they need access to the above information, and the omission of these metrics makes each financial analysis identified inherently misleading.

38.     In sum, the omission of the above-referenced information renders the Registration Statement materially incomplete and misleading, in contravention of the Exchange Act. Absent disclosure of the foregoing material information prior to the Shareholder Vote, Plaintiff will be unable to make an informed decision concerning whether to vote her shares, and she is thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

**(Against All Defendants for Violation of Section 14(a) of the Exchange Act)**

39.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

40.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the

Commission may prescribe as necessary or appropriate in the public interest or for the protection

of investors, to solicit or to permit the use of his name to solicit any Registration Statement or

consent or authorization in respect of any security (other than an exempted security) registered

pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

41.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange

Act, provides that Registration Statement communications shall not contain "any statement which,

at the time and in the light of the circumstances under which it is made, is false or misleading with

respect to any material fact, or which omits to state any material fact necessary in order to make

the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

42.     The omission of information from a Registration Statement will violate Section

14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted

information.

43.     Defendants have issued the Registration Statement with the intention of soliciting

the Company's common stockholders' support for the Proposed Transaction. Each of the

Individual Defendants reviewed and authorized the dissemination of the Registration Statement,

which fails to provide critical information regarding the valuation analyses performed by Goldman

Sachs in support of its fairness opinion.

44.     In so doing, Defendants made untrue statements of fact and/or omitted material

facts necessary to make the statements made not misleading. Each of the Individual Defendants,

by virtue of their roles as officers and/or directors, were aware of the omitted information but failed

to disclose such information, in violation of Section 14(a). The Individual Defendants were

therefore negligent, as they had reasonable grounds to believe material facts existed that were

misstated or omitted from the Registration Statement, but nonetheless failed to obtain and disclose

such information to the Company's stockholders although they could have done so without extraordinary effort.

45.     The Individual Defendants knew or were negligent in not knowing that the Registration Statement is materially misleading and omits material facts that are necessary to render it not misleading.  The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Registration Statement states that Goldman Sachs and Qatalyst reviewed and discussed their financial analyses with the Board, and further states that the Board considered the financial analyses provided by Goldman Sachs and Qatalyst, as well as their fairness opinions and the assumptions made and matters considered in connection therewith. Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and the details surrounding the process leading up to the signing of the Merger Agreement. The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Registration Statement, rendering the sections of the Registration Statement identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to, separately, review Goldman Sachs' and Qatalyst's analyses in connection with their receipt of the fairness opinions, question Goldman Sachs and Qatalyst as to their derivation of fairness, and be particularly attentive to the procedures followed in preparing the Registration Statement and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

46.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Registration Statement. The preparation of a Registration Statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes

negligence.  The Individual Defendants were negligent in choosing to omit material information from the Registration Statement or failing to notice the material omissions in the Registration Statement upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and preparation and review of the Company's financial projections.

47.     Slack is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Registration Statement.

48.     The misrepresentations and omissions in the Registration Statement are material to Plaintiff, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Shareholder Vote.  Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

49.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

50.     The Individual Defendants acted as controlling persons of Slack within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Slack, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Registration Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially

14

incomplete and misleading.

51.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Registration Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

52.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Registration Statement contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were thus directly involved in preparing this document.

53.     In addition, as the Registration Statement sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Registration Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

54.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

55.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

## COUNT III

### (Against the Individual Defendants for Breach of Their Fiduciary Duty of Candor/Disclosure)

56.     Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

57.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

58.     By virtue of their role as directors and/or officers of the Company, the Individual Defendants directly owed Plaintiff a fiduciary duty of candor/disclosure, which required them to disclose fully and fairly all material information within their control when they sought shareholder action, and to ensure that the Registration Statement did not omit any material information or contain any materially misleading statements.

59.     As alleged herein, the Individual Defendants breached their duty of candor/disclosure by approving and/or causing the materially deficient Registration Statement to be disseminated to Plaintiff and the Company's other public stockholders.

60.     The misrepresentations and omissions in the Registration Statement are material, and Plaintiff will be deprived of her right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Shareholder Vote. Where a shareholder has been denied one of the most critical rights he or she possesses—the right to a fully informed vote—the harm suffered is an individual and irreparable harm.

61.     Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.      Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Shareholder Vote or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Registration Statement;

B.      Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

C.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

D.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: January 6, 2021                           **MONTEVERDE & ASSOCIATES PC**

                                                 */s/ Juan E. Monteverde*
                                                 Juan E. Monteverde (JM-8169)
                                                 The Empire State Building
                                                 350 Fifth Avenue, Suite 4405
                                                 New York, NY 10118
                                                 Tel:(212) 971-1341
                                                 Fax:(212) 202-7880
                                                 Email: jmonteverde@monteverdelaw.com

                                                 *Attorneys for Plaintiff*